I think we'll have some similarities to the last one we just heard. I'm joking, I know there's a lot of similarities. So let's go ahead and hear, I guess we'll hear from Rafi Melkonian again. Am I pronouncing your name right? Okay, good. You can come on up. I think we've heard from you previously. And we'll hear again. Go ahead and add to what you've your honor. May it please the court. I was joking to myself this morning that maybe I should put on a different persona for this second argument, but I'll just be the same. So let me start with equitable estoppel because I didn't get to that in the first argument and I think there's a lot of stuff to talk about there. So I've already said that in my view, Bufkin is actually dispositive. Bufkin was applying federal common law and that case controls. Now, if our friends on the other side want to say that Bufkin, you know, went too far, it blazed the new trail, it shouldn't have done that, that's all fine. And we'll take that up after a panel opinion reaffirming Bufkin. But in our view, that's what Bufkin says. I don't see any explanation from them for how Bufkin could have written those last two paragraphs, why Bufkin was citing Grixen. I just don't understand how they can read Bufkin. I don't understand their argument for why Bufkin is federal, is state common law. Well, it cites a lot of state cases. It does cite a lot of state cases. That would be one indicia, right? I'm sorry, Your Honor? That's one indicia. That's one indicia. That it's citing state law. It's citing state law. But I do have an explanation for that. Those are state, they're actually mostly federal district court cases from Louisiana, or at least they're the ones they cite are. And those are because they're citing Grixen. As a general matter, Louisiana courts have applied equitable estoppel, see Pontchartrain, Louisiana case law. Now, yeah, it's talking about Grixen. Is that your point? That's my point, is that they're all citing Grixen. And so the reason the Bufkin panel was citing those was because of applications of Grixen in exactly this situation. But isn't that a weird way of putting it? I get your point that by citing Louisiana case law, that cites itself federal case law, that's somehow a suggestion that it's federal case law. But that's a weird way to put it if the panel's opinion says, as a general matter, Louisiana courts have applied. I agree. But the reason at that time that that sentence is in there is because Louisiana Supreme Court had not clarified whether Louisiana law was different than federal common law on that point. But if you look at the last two paragraphs of the opinion, I think it's quite clear, at least to me, that the court is not applying Louisiana law. It's not doing an eerie guess. There's none of the indicia in there of an eerie guess. If you're doing an eerie guess, usually there's a citation. It says, look, we look to the opinions of the Louisiana Supreme Court. And if those don't get us there, we look to the opinions of the intermediate courts of appeals, all that kind of language that we all use when we're talking about eerie. None of that. What about the sentence, numerous federal district courts applying Louisiana law have likewise held? I agree. Those are illustrative that in this exact situation, because those are cases like this one involving this policy. And so what I think the Bufkin court was doing was trying to apply, trying to find good examples of why this would apply in the same way. But it wasn't saying we're applying Louisiana law. It was applying federal common law as I think it says in the last two paragraphs of that case. And again, every indication to me from this opinion is that's what it was doing. But let me go beyond that to the extent your honors don't feel compelled to follow Bufkin. Now my friends on the other side say that there are all these cases that say that equitable estoppel under the convention is governed by state common law. We fundamentally disagree with that. So first of all, otokumpu, which is the latest word of the United States Supreme Court on exactly this topic, as I said briefly in my rebuttal a few minutes ago, otokumpu directly says we are not deciding that question. It's in one of the last paragraphs of that case. It says we do not decide which body of domestic law governs. And on remand, Judge Choflat took up that invitation. I agree it's a special concurrence. I'm not saying that's the controlling opinion of the 11th Circuit. And Judge Choflat does an analysis under the Supreme Court's decision in Boyle. He looks at the Supreme Court's decision in Shirk, which is the leading case on the convention, or one of the leading cases. And that case says the convention is of paramount importance. And the paramount importance of the convention is uniformity, is making sure that the convention isn't applied differently in Louisiana or Texas or Mississippi or any of the other states. And Judge Choflat says it must be federal common law that applies to the question of equitable estoppel under the convention. And that is exactly consistent with how this court described it in Bufkin. There's no tension between Louisiana law and federal law because the convention applies. Similarly, there's a 9th Circuit case that's cited in our briefs that says, and it's post-Arthur Anderson, I think it's post-otokumpu, it might be pre-otokumpu, I don't want to say one way or another, that applies federal common law to the question of equitable estoppel under the convention. Now Crawford, our friends on the other side say that this court held in Crawford that state common law applies. Crawford was not about the convention. Crawford is about Chapter 1 of the Federal Arbitration Act. Chapter 1 of the Federal Arbitration Act is the domestic Federal Arbitration Act. And when the Supreme Court was talking about Chapter 1 in Arthur Anderson, Crawford was talking about the state language in Chapter 1, Section 2 of Chapter 1, that points to pre-existing state law. That's what just the Scalia was saying in Arthur Anderson. And so when Crawford comes back and says, well, yes, with respect to the Federal Arbitration Act, that is state common law that governs equitable estoppel. What the court was saying there is with respect to the domestic Federal Arbitration Act. That opinion doesn't say anything about how the convention applies in these cases. And so, you know, point A is our view that Bufkin controls. If Bufkin doesn't control, then the question is under Boyle, what kind of body of domestic law do you use to apply a treaty? We think the right answer to that, just like really a lot of federal statutes, is the federal common law. And the reason for that is because of the paramount importance of uniformity of the application of the convention throughout the United States. If I might turn to two arguments that we're going to hear from my opponent in this case, which are a little bit different than the arguments made in the first case, at least he may go in a different direction, but I just want to address them first. My friends on the other side have argued that the service of suit clause that's contained in these policies is dispositive, that it somehow vitiates the arbitration agreement. That is both incorrect and foreclosed. It is foreclosed by this court's decision in McDermott, which is 35 years old, has never been abrogated, has never been doubted. And on top of it, it's incorrect. So what the service of suit clause is doing in this policy, again, let me point you to ROA, it's the Settlement of Claims language that I mentioned earlier, which is Roman numeral five. That says that all the liability under this policy is determined by arbitration or by agreement between the parties. So you have to get an arbitration award in order to get any money under this policy. That's what the policy says. And again, that's another part where our friends on the other side are turning this policy into surplusage. Because there is no other way to get any money under this policy other than through arbitration or agreement. So you get an arbitration award, that's what the policy says. Then what do you do with the arbitration award? You have to find somewhere to confirm or vacate that award so you can enforce it. And because these are international insurers, you want to make sure that they submit to jurisdiction somewhere so you can enforce this award against them. And that's what the service of suit clause is doing. And that's what McDermott said it was doing. It lets you sue somebody to confirm or vacate the arbitration award and then get it enforced in federal court or state court. And then it says that Lloyds and the other international insurers are going to comply with the orders of that court. Again, the worry is, are these international insurers going to say, we don't have any assets in the U.S.? Like, forget about your judgment. We agreed not to do that. That's what the service of suit clause is doing. That's what McDermott said it was doing. Argument's fully foreclosed. The other argument our friends on the other side are likely to make is that there's this kind of argument that the arbitration agreement itself must be signed in order to trigger the convention. That argument, too, is foreclosed by a case called Sphere Drake in 1994. Our opponents say that Sphere Drake has been disagreed with by other circuits, that there's some skepticism. Again, that's all fine. We are willing to fight that out in the next stage of litigation. But right now, the rule of orderliness governs. That is the ruling of this court. And the fact that it's governed by that, it was recognized in one of the cases they cite. I think it's Desaia or something like that, from Judge Costa in 2021, where he says, even if they had made the Sphere Drake argument, the argument's foreclosed because the Fifth Circuit opinion, the Fifth Circuit law is that as long as the arbitration agreement is in a contract, then it triggers the convention. You're talking about Neptune? That might be right. Just to make sure I understand. I think that's right. Yeah, Neptune versus Desaia. That's it, Your Honor. Yes, exactly. So Neptune v. Desaia recognizes that Sphere Drake is still the law of this circuit. That's all I'm saying. So I wanted to get back to the contract one last time, because I think that really is the fundamental point in this case, which is how do you read this contract other than that there is an arbitration agreement in the broad policy? And Judge Oldham asked the question about what do you do about this several liability notice? And again, I don't even think it's inconsistent with what we're saying. But even if Your Honor thinks it's inconsistent, I think the way it works is if you look at ROA 96, this is Section S, Requirements in Case of Loss, what it says is you have to go talk to the program manager. If there's a loss, you go and you make your claim to the program manager. There's only one program manager for this whole policy. And I should say, I think it's ROA, shoot, I lost that number, but there's one signature. AmRISC signs on behalf of all the insurers. There's not like several signatures, other documents. This is it. So AmRISC is the program manager. They sign on behalf of everybody. Section S says if you're going to trigger this policy, you give your claim to this program manager. The program manager then, then the liability is determined under Section 5, Settlement of Claims. That's the one we talked about earlier, where it says the only way to get liability in this case is by binding arbitration. And then there's this several liability notice Your Honor was talking about, and that divvies up the liability between the various insurers. Now, my friends on the other side, especially in the previous argument, say, oh, well, that's duplicative in some ways of the Lloyds language. It may be so. There may be cases where Lloyds isn't involved, and so the Lloyds endorsement isn't on there. And then this governs. These are composite contracts with all kinds of different endorsements to make sure that all the insurers can get involved. There's always going to be a little inconsistency in a contract of this complexity, and an old contract. These are contracts that have been around for many, many years. And the role of this court, I think, in terms of interpreting a contract is to try to give every provision a meaning and to bring it all into harmony. Having said that, Your Honor, I don't know that I have anything else. I have one quick question. Does the, what is it, the contra pro forentum canon, does that have any purchase here? I don't think it does. I'm not sure anybody's talked about it. Sorry? I'm not sure anybody's invoked it. I don't think any, I don't think our opponents have really invoked it with respect to this  I'm sort of curious why I've not seen that. Well, I'm not exactly sure why they haven't invoked it. I suspect it's because they think the contract is very clear in their side and they don't need the No, fair enough. That would actually be the sense. Everybody always says that their position is as clear as I honestly don't think it would make any difference. Even if you get, put a thumb on the scale against us, I think this contract is so clear with respect to the arbitration agreement, which covers every single person, the single arbitration agreement, and so clear with respect to how liability is divvied up once it's determined that I think that's where you have to end up with this contract. Counsel, one last question on the layers of participation. So the way I'm understanding how the liability is apportioned amongst the insurers is that it looks like each layer builds on the one in front of it. Does that make sense? So $10,000 in excess of the deductibles is paid by Lloyd's, $100,000 goes to QBE, $50 million? I don't think it's a tower in that way. So what does this mean in excess of deductibles and the layer of participation? How are each insurers related to the other? To determine the full amount of liability, as I think Judge Haynes was suggesting, and then this internal machinery divvies up all the liability based on what they agreed to. So some people have a $5,000 deductible. Some people have this other deductible. And the other thing I want to point out, Your Honor, is that these are not all exactly the same kind of insurance, all these little bits. If you look, there's a key on the next page that tells you some of this is wind, some is flood, whatever it is. And so sometimes they don't get triggered. So there's no circumstance where you've got two different insurers that are covering different levels of liabilities, like you would with reinsurance or secondary insurance? No, this is like they're all sharing together. That's what the contract is trying to do. So they're all sharing together one insured, one surplus line of insurance? That's right. But I guess my question is, if one insurance company fails to do its part, right, to cover the piece that it's responsible for, is there any recourse between the insurance companies? So it's not in the record, Your Honor. I believe the answer is yes, and it would be under this document. They would have a right against each other to make sure everyone contributes the amount they promised. But we have never litigated that question, and I don't want to get in the middle of my clients as to who can sue who. But I am pretty sure that if one of these said, no, I'm not going to pay that, there would be an issue between them. Very good. Thank you. Thank you, Your Honor. You've saved time for rebuttal. And now we will hear from Wells Watson on behalf of One Lakeside Plaza. May it please the Court, Wells Watson on behalf of One Lakeside. We are the plaintiff of Pele. So I want to just start by going over a few of the questions that were asked. I wasn't sure, did you mention the drafter principle? So the fact Judge Oldham talked about all these different ways this policy could be looked at, right? There's this thing, there's that. Well, that's their fault. That lands on them. They wrote it. So yes, the drafter principle applies here, and it applies strongly, because it's their language. So any ambiguity is construed against them. And the fact that we've been talking about this for so long shows there's ambiguities, at the very least. I think it's clear that they're separate policies. I'm going to read you something that no one has read yet, and it's on, it's in that same vein, but it doesn't just say separate contracts. And we've talked about separate policy numbers, but it says, this evidence of coverage consists of separate sections of a composite insurance for all underwriters at Lloyd's, contained, and separate policies issued by the insurance companies all identified below. No other way to read it. That's them. What are you reading from? This is record page 41. This is their language. So then they say, oh no, this is composite insurance. The only place the word composite appears is related to the Lloyd's group, because Lloyd's has all these different functioning parts. What do you do about the fact that there's so much stuff that is all together, and then there's just this trickle of individuals saying, I would only pay this much, or this percent, or this much, or whatever? Why is that not a bucket that is all of them? So your question earlier about the cubbies, right? That's joint liability. If one person, any person can be liable for the whole thing, that's solidary. It's the transit case. Judge Oldham was on the panel. It's solidary. If it's cubbies, and everybody's just liable for a piece, it's joint. But they didn't write it like that. They said, and it's the other page in here as far as the liability, and it says that it's several liability. And it says that it's the other page. But that, again, I'm going to admit, I'm trying to understand this. So I'm not saying I agree with you or I disagree with you. I'm just trying to understand. There's a huge area that is all together, and then there's this area of how much the insurer's going to pay. It seems to me that that's just making sure that if they've agreed to 10 percent, they don't have to pay the whole million. They can only pay the $100,000, as opposed to the $100,000 out the door, and they're the only one paying. Isn't that the cubby or the situation? Well, there's a lot of commonality, right? So each policy number is this policy, okay? There's no question. There's commonality between these policies, but they're separate policies. So you can say they have the same provision. Yeah, they have the same provision, but they're separate policies. And your point is, that's why they wrote it like that. They couldn't write it any other way. The overarching concern was, we don't want to have to pay for somebody else. If someone doesn't pay, so you asked, okay, is there some agreement? Well, that's not in the record as to how they do it, all right? And so the thing is, they're separate, and they want to make sure they stayed separate. When I went bankrupt, they didn't have to step in. Sometimes you can flip the script and you answer the question, right? So let's say I'm here, and steadfast insurance doesn't pay. And so I say, okay, I'm going to sue under this one policy. I don't care which one of you pays, but I want to be paid. What would they say? Would we be talking about one policy anymore? Of course not. They'd say, no, no, your policy number with steadfast is this. Steadfast owes this. We wouldn't have one lawyer anymore on this side. We'd have a bunch of them, and they'd be differing, and they'd say, look, that's between you and steadfast. Look at the policy you did with Would there be agreements to be A, B, and C all together, and then D is different from E and F? I mean, isn't that true in life, that you and I could agree to do all this stuff, but then also disagree about one thing, if we were friends? You can, Your Honor. You can have differences, but it's not written like that. It's written as separate policies with separate numbers. And if they had written it like that, and they'd have said that, it's their pencil. They could have written whatever they wanted. In other words, it could have said separate for purposes of liability, but not separate for purposes of arbitration and all the rest. But they could have said this is one, and I'm going to get to an important part that Well, but your opponent claims that it is clear that it's just talking about the liability. You think it's very clear that it's talking about it all. So this is the part we have to try to figure out. Y'all can make great arguments against each other. We have to decide the case. And you can't, they can't have it both ways, right? They can't say, okay, it's one policy for the purpose of an arbitration agreement, but it's separate policies for the purpose of our liability and other aspects of it. You can't do that. Well, just to be clear, I thought you said that they could do that. They just didn't do that here. Well, they could have written it differently. All right, right. That's right. They can do that. That's right. The question is whether they did do that. They didn't. And so any ambiguity is against them, and I don't think it's any question that there's ambiguity at the least. I think it's pretty clear they're separate policies and they did it for their own self-serving purposes. Well, it has to be reasonable ambiguity, as you know, because one thing I know, having been a lawyer and, of course, dealing with lawyers all the time, is you can almost always find something wrong, and that's not enough. I mean, I'm technically still a lawyer, but you know where I'm sitting. I don't represent clients. You asked why is there an arbitration provision. It's a form, and they said it's a form. That's what we have. We have a form, and it's the COMPAS form, and this insurance is meant to apply to all 50 states. If you look at the service of process endorsements, which I'm going to get to, it's meant to apply to a bunch of states. The business about equitable estoppel and the convention, first, that's the cart before the horse. First, you have to find the convention applies, all right? And the convention doesn't apply because there's not one international party sitting in this courtroom or in this case. There are eight separate agreements with domestic carriers, and so the prerequisite of the convention is you have an international party. This isn't even international commerce. You know, we're talking about a building in Lake Charles, Louisiana. We're talking about an insurance policy delivered in Louisiana. We're talking about a Louisiana hurricane. We're talking about separate premiums. There's no international commerce here, so the treaty doesn't apply. The McCarran-Ferguson Act says we look at the state's law, enlists the treaty. That's what the United States Fifth Circuit has said. McCarran-Ferguson Act is Congress's pronouncement, Louisiana law, so we can't have an arbitration agreement. I'm going to turn you to something that I think that answers these questions in a second way, and those are the service of process clauses, and they call them different things. I mean, that's a generic term, but you can call them service of process endorsement. You can call them company mandatory. You can call them different things. They're attached to this policy, and they change the policy. They say, this endorsement changes the policy. Please read it carefully. That's what they wrote. The only way these endorsements can change the policy is by supplanting the arbitration clause. There is no arbitration clause. These endorsements, they put in here, and their one argument is that it confers personal jurisdiction, that once you have an arbitration award, you look at the service of process endorsements, and you say, okay, this is how you enforce that award. That is what they say. Your honors, that doesn't make any sense, and it's not Wells Watson that says it doesn't make any sense. It's the United States Fifth Circuit Court of Appeal that says it doesn't make any sense, and it's a case they run from, and they filed 90 pages of brief in this case, and they offer one line on this case because there's no way to distinguish it. It's called City of Rose City versus Nutmeg, and in that case, City of Rose City is a domestic insured. Nutmeg is a domestic insurance company, so City of Rose City filed in state court. Nutmeg wanted to remove the case. There was a service of process endorsement, and the question was whether the service of process endorsement allowed City of Rose City to pick the form and precluded removal, so what did this court say? This court said, yes, your service of process endorsement allows City of Rose City to pick the form, the plaintiff to pick the form, and if you wanted to remove it, all you had to do was write it in there, and so you know what happened after City of Rose City, a bunch of insurance companies wrote in there. It doesn't preclude us from removing it. You could have written it. You could have written it, so their argument is it's for personal jurisdiction. Nutmeg made that same argument before this court and said, oh, your Honor, you're looking at it . . . they're looking at it wrong. This just confers personal jurisdiction, and this court said that makes no sense. Why? Because they're all domestic carriers. You don't need a service of process endorsement to confer jurisdiction on United States companies. Makes no sense, so then McDermott came around, so when they love and they think it applies uniformly to everything, no, McDermott, extremely well written, took a lot of time and effort, as was Nutmeg, and McDermott said, yeah, we get Nutmeg. We get what Nutmeg held, but McDermott had a really cool phrase, and it said a clause or a word can mean different things depending on where it lives, and it said we distinguish Nutmeg for two reasons. One is Nutmeg had a domestic carrier. Two, Nutmeg had the drafter principle. McDermott had McDermott and Lloyd's. McDermott helped draft it, so McDermott wanted to choose the forum. Lloyd's says the service process doesn't let you do that. It confers personal jurisdiction. Because Lloyd's was an international carrier, McDermott said, oh, that's reasonable, but we could look at it two ways, but we don't have the drafter principle in our case, so we're going to look at it as Lloyd's said, so they're saying it did confer jurisdiction on the international carrier. The distinction here is they all have endorsements. They all have endorsements. It's not just one. Counsel, with all due respect, kind of implied there's one endorsement. No, no, no. They all have endorsements. I'm not trying to move on, but I do want to be sure that I ask you about the difference between public and private. If, and I'm not saying we will, but if we were to conclude that public could make a difference, y'all are private. Can you explain? Mr. Flanagan, I think all it does is reinforce the fact that Louisiana law doesn't allow arbitration insurance agreements. It made a little more of a difference before the Supreme Court decision, Louisiana Supreme Court decision, but now it's pretty clear. I mean, there was an issue of 22868 as to whether it had an exception for surplus lines carriers. That would be the distinction. I think even the defendant, it's the treaty applies or doesn't apply, basically. That's what this case is. If the treaty applies, it doesn't matter what Louisiana law says. If it doesn't apply, then it is Louisiana law under the McCarran-Ferguson Act. But I want to . . . You don't think public versus private, then? Makes no difference now, no. But I want to stay with my service. I'm sorry, I don't want to stay with the service. I just wanted to be sure I asked that before time went out. QBE insurance has their own endorsement. It applies to what? QBE insurance's policy. You don't have one policy with separate endorsements for a bunch of companies. That's not the way it works. This shows there's one policy. I mean, there are multiple policies, one policy per insurance company. It says this. This endorsement changes the policy. It says when a cause of action arises in any of the states below, service of process is here. Cause of action is a lawsuit. Okay. I mean, when I was acting as a lawyer directly for clients, I did do some insurance, and endorsements are something that come up in a lot of insurance policies. But that doesn't mean that it throws out the rest of the insurance. It's just cubbying what it's saying. So I don't understand the concept that an endorsement ends everything, because that certainly would have made my cases very different than they were. I'm sorry. Maybe I was confusing. It doesn't throw out everything. But per their own words, it changes the policy. Endorsements are added for certain reasons. Right. But it changes. So, you know, you might have they were always long, and I would have to spend time reading them. But they might change. So you have like, you know, let's say 20 pages, and they change one sentence. That doesn't mean the rest of the 20 pages are gone. So I'm a little bit struggling with what you're saying on this endorsement concept. Okay. So the endorsement doesn't. You're right. It doesn't change 20 pages. It changes one thing. It changes the arbitration page. Because it says a cause of action arises in any of the following states. A New York arbitration and a New York arbitration award wouldn't arise in Arizona, Alaska, Louisiana. Okay. So the only thing it could change is the arbitration provision. Their language. Their language. The only place, it's like if there was no nuclear liability or no act of war, whatever the endorsement is, it will change something. But the only thing it could change is the arbitration provision. Because it references a cause of action arising in all these states. It doesn't say anything. It's just like the nutmeg one. It doesn't say anything about arbitration. Per nutmeg, they could have written it. All right. Let me get you to the most fun document that I think really they can't run from. That's the Lloyd's endorsement. Lloyd's has an endorsement. All right. Number one, they're arguing that we should be compelled to join an arbitration with Lloyd's. There's been no proof of some arbitration with Lloyd's. There's no proof that Lloyd's is even an international carrier. I'm an officer of the court, and I'll tell you, I think Lloyd's is London, right? But there's no evidence in the record other than an address in the policy. And then there's another address that shows the United States. They haven't proven an international carrier, the German carrier or Lloyd's. However, more importantly, look at the Lloyd's endorsement. Here's what it says. I'm not sure what page are you looking at? This is, I am sorry, Your Honor, 318. With respect to the coverage provided by certain underwriters of Lloyd's, the following clauses, service of suit and applicable law apply, shall apply, changes the policy. What does Lloyd's law section say? This insurance shall be subject to the applicable state law, Lloyd's language, state law to be determined by the court of competent jurisdictions as determined by this service of suit clause. There's nothing about New York law. There's nothing about arbitration. And they're saying the law that applies is state law determined by a court. Now, if it was New York law, if it was arbitration, it would say it. That's what Nutmeg says. You can write it, right? Any ambiguities are interpreted against them. This clearly displaces any alleged arbitration against the international carrier. So, Your Honor, the last document I'm going to point you to, when I say they could have written it, they did write it. They wrote it, but not in this case. They wrote it in another case. And this is record page 696. Here's a service of suit clause written in another Lloyd's policy. And you know what this says? This service of suit clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided by any arbitration provision in this policy. This service of suit, Lloyd's endorsement, doesn't have an applicable law sanction. And it specifically says it doesn't override the arbitration agreement. They could have written it. It's construed against them. The only way to read these process endorsements, and they all have them, to change the policy is to get rid of the arbitration provision. That's another reason this case is not subject to arbitration. Thank you very much. Thank you. Okay. We'll hear some more from Wilconian. Yes, Your Honor. Four points, Your Honors. First, my opponent, we just heard, says that there are eight different policies that are represented by this one document. And I think I said this in one of my previous forays up here. If that's so, where are these other documents? What provisions govern them? How do you determine liability under them? Where are the exclusions? None of that is true. There is one policy that determines liability, and then that filters through into these contracts. Second, the contra preferential— Just by the fact that it's one document. No, no. I'm not—I don't want to— Yeah, because obviously you can have one document representing— Of course you could, Your Honor, but I think it would need to— Common contract by reference. It would need to explain how that one couple words of this contract, the contract allocation endorsement, that talks about a contract, transforms a policy into— Why aren't the endorsements enough? Excuse me? Why aren't the endorsements enough? You've got several pages of endorsements, including the separate contract language. Why isn't that enough to— Well, because I think you have to harmonize them, and so you have to understand what they do together, and the contract allocation endorsement is an endorsement. We're not arguing with that. It definitely changes the policy, but then you have to harmonize them together and try to see what they mean, and I think if you read the contract allocation endorsement, it's clear that there's still this overarching policy in which there is one arbitration agreement, and that's the one that is being triggered by these suits. It doesn't mean—that provision doesn't mean the entire policy is now suddenly transformed into all these different policies. If it said that, there would really need to be a lot more machinery to do that, because that means you have to amend all these words, things turn into singulars. It doesn't make any sense, from my perspective, for that to be how you read this. But that's what I guess I'm not understanding is why do you need the machinery? Why can't it just be incorporated by reference? And the fact that singular becomes plural, I mean, insurers don't individualize contracts with every policyholder. That would be wildly inefficient. As your opposing counsel just said, it's a form. Well, I would push back a little bit on a form. These are very complicated surplus alliance policies. I'm not sure they're all forms. I mean, you can negotiate these. But you get my point. It's not every policy is specially written for that client. But I think, look, the contract allocation endorsement says what it says. We're not running from it. What we're saying is you need to try to harmonize it with the rest of the policy. And it says very directly, this contract is construed as separate contracts. In the very same sentences, it talks about the policy. The policy and the contract are differentiated by these drafters to be different things. And we have to give meaning to that. That's all I'm saying. And if you give meaning to that, I think you come out to where we are. On contra profferentum, our opponents never raised that, as Judge Ho mentioned earlier. I think that really only applies, having thought about it for a second, I think that really only applies to coverage decisions. This is not even a coverage decision. This is whether arbitration applies. And I don't think that principle applies there at all, where if there's any ambiguity, then you go towards the other side. I don't think that's how this court has ever done arbitrability in the context of insurance policies. My friend spent a lot of time on this Nutmeg case. We are not running from Nutmeg. Nutmeg is distinguished in McDermott. Nutmeg predates McDermott. And the McDermott court, talking about a service of suit clause that's exactly like the Lloyd service of suit clause here, they're the same service of suit clause, says Nutmeg's different. It's not in the context of two plausible form selection clauses. Here, there's a second form selection clause, which is the leave with this one note. I think I heard my friends on the other side concede or not dispute that if we're right about Bufkin, or if we're right about federal common law applying without Bufkin, then they are equitably estopped. They didn't come up here and say there's some kind of factual distinction between Bufkin and this case. They said Bufkin is Louisiana law. You lose under Louisiana law. I get that. We said what we said. But they don't come up here and say there's some kind of factual change. It's exactly the same thing. They took money from the foreign insurers. They've been paid under two of these cases. They have a dispute about how much they've been paid. But they've been paid something in two of the cases. And now they're trying to escape the arbitration clause by suing only the domestic insurers. It's exactly the procedural gamesmanship that this court was talking in Bufkin. And that's not my words. I'm quoting the court. Procedural gamesmanship with respect to how they decided to sue who. With that, Your Honors, we ask you to reverse to compel arbitration in these cases and by implication to compel arbitration in many cases that are heading your way in the future. Thank you. Okay. We thank you all. And we are now done for today.